ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| SUIZA DAIRY, CORP.<br><br>Recurrente<br><br>V.<br><br>OFICINA PARA LA REGLAMENTACIÓN DE LA INDUSTRIA LECHERA<br><br>Recurrida | KLRA202200653 | Revisión de Decisión Administrativa procedente de la Oficina para la Reglamentación de la Industria Lechera<br><br>Órdenes Administrativas Núm. 2022-61; 2022-62; 2022-64<br><br>Sobre:<br>Impugnación de órdenes |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Brignoni Mártir y el Juez Candelaria Rosa

Juez ponente, Brignoni Mártir

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de enero de 2023.

Comparece Suiza Dairy Corporation (Suiza o recurrente) mediante un recurso de revisión administrativa en el que solicita que declaremos nulas las Órdenes Administrativas Núm. 2022-61 (Orden 61), 2022-62 (Orden 62) y 2022-63 (Orden 63) emitidas por el Administrador de la Oficina de la Reglamentación de la Industria Lechera (ORIL o recurrida). En esencia, dichas órdenes administrativas establecen una distribución específica de leche excedente para cada una de las plantas elaboradoras, entiéndase Suiza, Vaquería Tres Monjitas (VTM) e Indulac, desde el 10 de noviembre hasta el 4 de diciembre de 2022.

Por los fundamentos que expondremos a continuación *declaramos nulas* las órdenes administrativas impugnadas.

I

El 8 de noviembre de 2022, el Administrador de la ORIL emitió la Orden 61 con vigencia inmediata. En ésta analizó la data de producción y utilización de leche durante el periodo comprendido entre el 13 de octubre 2021 y el 28 de septiembre de 2022. Como parte de dicho análisis

estableció las cantidades y proporciones de excedente de leche[1] que Suiza, VTM e Indulac utilizaron en ese periodo para elaborar productos fluidos[2] y otros productos[3]. Basado en esas proporciones, ordenó lo siguiente en cuanto a la distribución de leche excedente:

1. "[Q]ue a partir del 10 de noviembre de 2022, Suiza, Vaquería Tres Monjitas e Indulac recibirán un abasto de leche cruda excedente para suplir la demanda de leche fluida y no fluida de cada una de las plantas en la proporción de su necesidad reflejada por su utilización según establecido en esta orden, y en el Anejo A."

2. Se ordena, a Suiza, Vaquería Tres Monjitas e Indulac, a informar a ORIL por escrito cada miércoles de cierre de catorcena su plan de utilización de leche excedente durante la catorcena que habrá de iniciar.

3. Se ordena, a Suiza, Vaquería Tres Monjitas e Indulac, a solicitar variaciones a los volúmenes y proporciones dispuestos en esta orden y en el Anejo A con 5 días de antelación al Administrador para su aprobación, anejando toda información pertinente que sustente y/o justifique el cambio solicitado. […]

El 10 de noviembre de 2022, el Administrador de ORIL emitió la Orden 62. En ésta, basado en estimaciones de producción de leche cruda para la quincena del 10 al 23 de noviembre de 2022, dispuso lo siguiente sobre la utilización y distribución del excedente:

1. Se ordena a Suiza, Vaquería Tres Monjitas e Indulac utilizar el excedente según establece la presente Orden Administrativa y cuya distribución está basada en la Orden Administrativa Núm. 2022-61:
   a. Excedente fluido para el mercado local:
      i. Suiza (35%): 703,838 cuartillos
      ii. Vaquería Tres Monjitas (5%):103,325 cuartillos
      iii. Indulac (60%): 1,187,298 cuartillos
   b. Excedente para otros productos:
      i. Suiza (14%): 84,606 cuartillos
      ii. Vaquería Tres Monjitas (42%): 253,058 cuartillos
      iii. Indulac (44%): 268,131 cuartillos

2. Se ordena a Suiza y Vaquería Tres Monjitas enviar a Indulac de forma ordenada y coordinada los siguientes volúmenes de excedente:
   a. Suiza: 1,067,525 cuartillos

---

[1] 57,915,161 cuartillos de leche excedente se utilizaron para elaborar productos fluidos, en una proporción de 35% por Suiza, 5% por Vaquería Tres Monjitas y 60% por Indulac. 17,591,071 cuartillos de leche excedente se utilizaron para elaborar otros productos en una proporción de 14% por SDC, 42% por Vaquería Tres Monjitas y 44% por Indulac.
[2] Tales como: UHT (leche ultra pasteurizada), MST (leche pasteurizada de larga duración) y ESL (leche pasteurizada de larga vida útil).
[3] Tales como: crema, *heavy cream*, *sour cream*, fresca/MST/UHT/ESL para exportación, sustitución de leche en polvo y otros.

      b. Vaquería Tres Monjitas: 387,904 cuartillos

3. Se ordena a Suiza y Vaquería Tres Monjitas que de retener más leche cruda para elaborar leche fresca, tendrán que informarlo por escrito al Administrador de modo que éste ajuste los volúmenes asignados, si fuera necesario.

4. Se ordena a Suiza y Vaquería Tres Monjitas informar por escrito al Administrador las causas para el incumplimiento con la Orden Administrativa Núm. 2022-61, en un término de cinco (5) días laborables.

5. Se advierte, que el incumplimiento con cualquier Resolución u Orden del Administrador, expone a quien la viole, a multas administrativas y las penalidades establecidas en los Artículos 11 y 24 de la Ley Núm. 34 de 11 de junio de 1957, según enmendada.

De manera similar, el 23 de noviembre de 2022, el Administrador de la ORIL emitió la Orden 64. En ésta, basado también en estimaciones de producción de leche para la quincena del 24 de noviembre de 2022 al 7 de diciembre de 2022, dispuso lo siguiente sobre la utilización y distribución del excedente:

1. Se ordena a Suiza, Vaquería Tres Monjitas e Indulac utilizar el excedente según establece la presente Orden Administrativa y cuya distribución está basada en la Orden Administrativa Núm. 2022-61:
       a. Excedente fluido para el mercado local:
           i. Suiza (35%): 812,080 cuartillos
           ii. Vaquería Tres Monjitas (5%): 119,215 cuartillos
           iii. Indulac (60%): 1,369,891 cuartillos

       b. Excedente para otros productos:
           i. Suiza (14%): 97,617 cuartillos
           ii. Vaquería Tres Monjitas (42%): 291,976 cuartillos
           iii. Indulac (44%): 309,366 cuartillos

2. Se ordena a Suiza y Vaquería Tres Monjitas enviar a Indulac de forma ordenada y coordinada los siguientes volúmenes de excedente:
       a. Suiza: 1,201,978 cuartillos
       b. Vaquería Tres Monjitas: 477,279 cuartillos

3. Se ordena a Suiza y Vaquería Tres Monjitas que de retener más leche cruda para elaborar leche fresca, tendrán que informarlo por escrito al Administrador de modo que éste ajuste los volúmenes asignados, si fuera necesario.

4. Se advierte, que el incumplimiento con cualquier Resolución u Orden del Administrador, expone a quien la viole, a multas administrativas y las penalidades establecidas en los Artículos 11 y 24 de la Ley Núm. 34 de 11 de junio de 1957, según enmendada.

En desacuerdo con el contenido de las órdenes antes reseñadas Suiza presentó un *Recurso de revisión administrativa* el 8 de diciembre de 2022.[4] Solicitó que decretemos su nulidad de las órdenes ya que según alegó, la ORIL erró en lo siguiente:

> AL ENMENDAR DEFINICIONES ESTATUTARIAS Y REGLAMENTARIAS MEDIANTE ÓRDENES ADMINISTRATIVAS QUE MODIFICAN LA FUNCIÓN DE LA PLANTA DE BALANCE INDULAC SIN CUMPLIR CON EL PROCESO ADMINISTRATIVO APLICABLE, ACTUANDO DE MANERA CAPRICHOSA Y ARBITRARIA.
>
> AL VIOLENTAR EL ACUERDO DE TRANSACCIÓN QUE TIENE FUERZA DE LEY ENTRE LAS PARTES Y QUE FORMA PARTE DE LA SENTENCIA FEDERAL EN EL CASO 04-1840, QUE ESTABLECE QUE LA REPARTICIÓN DE RUTAS DE LECHE CRUDA SE HARÁ EN FUNCIÓN DE LA PARTICIPACIÓN EN EL MERCADO CORRESPONDIENTE DE CADA PLANTA DE PROCESAMIENTO DE LECHE FRESCA.

A solicitud nuestra, la ORIL presentó su *Alegato.* Por tanto, con el beneficio de la posición de ambas partes, esbozamos el marco jurídico aplicable y resolvemos conforme al mismo.

II

### A. Ley para Reglamentar la Industria Lechera y el Reglamento 10

La Ley para Reglamentar la Industria Lechera, Ley Núm. 34 de 11 de junio de 1957, según enmendada (Ley 34), se adoptó para crear la Oficina para la Reglamentación de la Industria Lechera (ORIL) y determinar sus poderes y facultades para reglamentar esta industria. Preámbulo de la Ley 34, *supra*. Según se dispuso, el Administrador de la ORIL sería nombrado por el Secretario del Departamento de Agricultura con aprobación del Gobernador. 5 LPRA sec. 1094. A este se le otorgaron los siguientes podres y deberes:

> Artículo 5: <u>Poderes y deberes del Administrador</u>
> (a) Poderes generales - El Administrador tendrá el poder de investigar y <u>reglamentar todas las fases de la industria de la leche y los productos derivados de ésta,</u> en el Estado Libre Asociado de Puerto Rico, incluyendo la producción, elaboración, esterilización, manufactura, almacenaje,

---

[4] Suiza acompañó su recurso con una solicitud de paralización del efecto de las órdenes administrativas hasta tanto atendiéramos el caso en los méritos. ORIL presentó su oposición a la paralización y a su vez, solicitó la desestimación del recurso por falta de jurisdicción. Examinada la posición de ambas partes, emitimos una *Resolución* el 14 de diciembre de 2022, denegando la paralización y la desestimación solicitadas.

compra y venta, transportación y distribución del producto principal y sus derivados. […]

(b) En adición a los antes expresados, y a los demás reconocidos en otras disposiciones de … este título, el Administrador también tendrá las siguientes atribuciones y poderes:

(1) ....

(2) …

(3) ...

(4) Formular los planes necesarios para disponer de la leche excedente a los fines de proteger integralmente la industria.

(5) Establecer normas de elaboración, esterilización, clasificación, empaque, envase, enlatado, rotulación, calidad y presentación de la leche y de sus productos derivados.

(6) Establecer sistemas de entrega por los productores y elaboradores y de recibo por los elaboradores y otros manipuladores de leche o de sus productos derivados.

(7) Evitar prácticas monopolizadoras y de competencia desleal, así como discrímenes en las diversas fases de la industria desde la producción hasta la venta de la leche o de sus productos derivados al consumidor.

(8) …

(9) Investigar las transacciones y relaciones comerciales de los productores, elaboradores, esterilizadores y detallistas entre sí, así como las de cualesquiera de ellos con los consumidores.

(10) …

(11) Requerir de las personas que operan negocios dentro de la industria de la leche y sus productos derivados que lleven los récords e historiales y formularios y rindan los informes que el Administrador considere necesarios para efectuar la política pública y los fines de dichas secciones.

(12) …

(13) Preparar estadísticas y diseminar toda la información útil respecto a la operación y desarrollo de la industria de leche y sus productos derivados.

(14) …

(c) En el ejercicio de los poderes concedidos en esta sección y en las otras disposiciones de las secs. 1092 a 1118 de este título, el Administrador queda expresamente autorizado para tomar todas las medidas pertinentes para hacer efectivas las disposiciones de las mismas.5 LPRA sec. 1096.

De otro lado, conforme a las facultades de reglamentación conferidas, el Administrador de la ORIL adoptó el Reglamento 10, conocido como *Reglamento 10 de la Industria Lechera para establecer las fórmulas para canalizar el excedente, fijar precios de la leche en todos sus niveles y establecer las normas de expansión en la producción,*

aprobado el 10 de agosto de 2005. [5] (Reglamento 10). El propósito específico de este cuerpo reglamentario es establecer fórmulas para la canalización efectiva del excedente de leche que se produce todos los años y para la solución de los problemas de relaciones entre los elaboradores y los productores de leche. Art. 2 (a), Reglamento 10. Este reglamento aplica a toda persona, natural o jurídica, que se dedique a la elaboración, pasteurización, ultrapasteurización u homogeneización de leche producida en vaquerías o a la distribución o venta de leche fresca o ultrapasteurizada en Puerto Rico. Art. 3 (c), Reglamento 10.

En su Sec. 4 el Reglamento 10 establece las siguientes definiciones:

> Sección 4: Definiciones
> d. **Elaboradores** – significa las personas que son dueños, administradores o encargados de establecimiento de pasteurizar o ultra pasteurizar y homogeneizar leche.
>
> e. **Elaborador de productos derivados de leche** – significa aquella empresa que se dedica a la elaboración de productos lácteos utilizando con materia prima el excedente de leche.
>
> g. **Excedente de leche** – significa la leche cruda que los elaboradores no procesan como leche fresca y que está disponible para la elaboración de otros productos lácteos.
>
> h. **Indulac** – es el nombre bajo el cual hace negocios la Industria Lechera de Puerto Rico, Inc., la cual es una corporación con fines de lucro cuyo único accionista es el Fondo para el Fomento de la Industria Lechera y cuyo fin primordial es servir como planta balance del excedente de leche y elaborar productos lácteos con dicho excedente.
>
> i. **Leche cruda** – significa secreción láctea integra, excluyendo el calostro, que se obtiene mediante el ordeño de una o más vacas saludables en las vaquerías de los productores, que no ha sido sometida a ningún proceso.
>
> k. **Leche fresca** – significa leche de vaquerías pasteurizada y homogeneizada, por un elaborador, que se expende para consumo directo del público.
>
> n. **Leche retenida** – es la leche que retienen los elaboradores para procesarla como leche fresca. Sec. 4, Reglamento 10, *supra.*

De otro lado, la Sec. 8 del Reglamento 10 establece las reglas para distribuir el excedente de leche al indicar, en lo aquí pertinente, lo siguiente:

---

[5] Enmendado por el Reglamento 8657 del 11 de diciembre de 2015.

Sección 8: <u>Canalización del excedente de leche</u>
a. Los productores deberán entregar la producción total de leche cruda de sus vaquerías a los elaboradores con quienes han contratado su venta o a un elaborador de productos derivados, previa autorización del Administrador.
b. La leche cruda que se produce en Puerto Rico se utilizará, en orden de prioridad, utilizándose en primera instancia para la elaboración de leche fresca. <u>Luego de agotada la demanda para leche fresca, el remanente el cual es el excedente, se utilizará para la elaboración de otros productos por dichas plantas elaboradoras de leche fresca y por Indulac, como una planta de balance, y por elaboradores de productos derivados</u>. El orden de prioridad de los productos derivados elaborados con el excedente será determinado a base del rendimiento económico para el ganadero, comenzando con los de mayor rendimiento y continuando, en escala descendente, con los restantes. Disponiéndose que no se elaborará ningún producto de menor rendimiento si hay demanda por productos de mayor rendimiento.
c. El excedente de leche será retenido o transferido por los elaboradores, a otro elaborador de productos derivados de la leche. Todas estas transacciones requieren la notificación a y la aprobación por el Administrador. La autorización del Administrador requerirá, pero no se limitará, a que se le demuestre que dicho excedente no puede ser elaborado como leche fresca, y luego de la demanda para productos de mayor rendimiento.
d. …
e. …
f. …
g. Las decisiones del Administrador en cuanto a la canalización o disposición del excedente de leche, estarán basadas en las circunstancias particulares de la Industria en el momento en que se tomen. Entre ellas, tomará en consideración las circunstancias particulares de cada elaborador que se proponga utilizar el excedente y el grado de necesidad que tenga del mismo para su operación normal. A tales fines, el Administrador calculará la cantidad de leche excedente que se producirá prospectivamente y adjudicará las porciones del mismo <u>solicitadas por los elaboradores</u> y la prioridad o preferencia de acceso a dicho excedente de cada uno de ellos. Sec.8, Reglamento 10, *supra.*

**B. Procedimiento para enmendar reglamentos según LPAU**

Las agencias administrativas gozan del poder cuasilegislativo de reglamentación para aprobar, enmendar o derogar reglas y reglamentos. Sec. 1.3 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 38-2017, según enmendada (LPAU), 3 LPRA sec. 9603 (n); *Sierra Club v. Jta. Planificación*, 203 DPR 596, 605 (2019). La Sec. 1.3 (m) de la LPAU define regla o reglamento como:

cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o

interprete la política pública o la ley, o que regule los requisitos de los procedimientos o prácticas de una agencia que tenga fuerza de ley. El término incluye la enmienda, revocación o suspensión de una regla existente. […] 3 LPRA sec. 9603.

Las reglas que las agencias pueden formular se distinguen entre reglas no legislativas y reglas legislativas. *Mun. de Toa Baja v. DRNA,* 185 DPR 684, 696 (2012). Dependiendo del tipo de regla es el procedimiento que se ha de seguir para su aprobación, derogación o enmienda. Las reglas no legislativas son pronunciamientos administrativos que no alteran los derechos ni las obligaciones de los individuos. *Íd.* Este tipo de reglas no tienen que cumplir con el procedimiento formal de la LPAU. *Sierra Club v. Jta.*, supra, pág. 605.

De otro lado, las reglas legislativas son aquellas que crean o afectan derechos, imponen obligaciones y establecen un patrón de conducta que tiene fuerza de ley. *Íd.; Mun. de Toa Baja v. DRNA*, supra, pág. 697; *Mun. de San Juan v. J.C.A.*, 152 DPR 673, 692 (2000). Las reglas legislativas modifican y alteran los derechos de los individuos y hacen más específica la ley ejecutada o administrada. *Asociación de Maestros de Puerto Rico v. Comisión*, 159 DPR 81, 95 (2003). Son reglas que tienen un efecto obligatorio significativo en los derechos sustantivas de los afectados y cubiertos por ella. *Mun. de Toa Baja v. DRNA*, supra, pág. 697. Por la importancia que estas revisten y el efecto que pueden acarrear para el público en general, su aprobación, revocación y enmienda requiere el cumplimiento del procedimiento de reglamentación exigido por la LPAU. *Sierra Club v. Jta. Planificación*, supra.

En su Capítulo II, la LPAU establece los requisitos a seguir al aprobar, enmendar o derogar una regla o reglamento. Sec. 2.1, 3 LPRA sec. 9611. Así, para que la reglamentación sea válida deben cumplirse cuatro requisitos básicos: (1) notificar al público la reglamentación que ha de aprobarse; (2) proveer oportunidad para la participación ciudadana, incluyendo vistas públicas cuando sea necesario u obligatorio; (3) presentar la reglamentación ante el Departamento de Estado para la

aprobación correspondiente, y (4) publicar la reglamentación aprobada. Secs. 2.1, 2.2, 2.3, 2.8 y 2.11 de la LPAU, 3 LPRA secs. 9611-9613, 9618 y 9621; *Mun. de Toa Baja v. DRNA*, supra, pág. 694; *Mun. de San Juan v. J.C.A.*, supra, págs. 690-691.

Los requisitos antes mencionados son imprescindibles y de ineludible cumplimiento al promulgar una regla o reglamento. *Sierra Club v. Jta. Planificación*, supra, pág. 606. Esto ya que, forman parte de las garantías procesales del debido proceos de ley que permean la LPAU y su cumplimiento es indispensable para reconocerle fuerza de ley. *Centro Unido de Detallistas v. Com. Serv. Púb.*, 174 DPR 174, 183 (2008). Cónsono con ello la LPAU establece que una regla o reglamento que no cumpla con estas disposiciones será nulo. Sec. 2.7 de la LPAU, *supra,* 3 LPRA sec. 9617. Por tanto, quien interese impugnar la validez de su faz de una regla o reglamento por el incumplimiento de las disposiciones del estatuto, puede presentar un recurso a esos efectos ante este Tribunal de Apelaciones dentro de los treinta días siguientes a la fecha de su puesta en vigor. *Íd.* La impugnación que asi se inicie no paralizará la vigencia de la regla o reglamento, a menos que la ley al amparo de la cual se adopta disponga expresamente lo contrario. *Íd.*

En cuanto al alcance de la revisión judicial de las determinaciones administrativas es preciso considerar que las decisiones de las agencias gozan de la mayor deferencia por los tribunales. *The Sembler Co. V. Mun. de Carolina*, 185 DPR 800, 821 (2012). Esto implica que tales determinaciones tienen a su favor una presunción de legalidad y corrección que debe respetarse. *DACo v. AFSCME*, 185 DPR 1, 26 (2012); *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 744 (2012). Ello es así, ya que las agencias son las que cuentan con conocimiento especializado en los asuntos que les han sido encomendados, así como con vasta experiencia en la implantación de sus leyes y reglamentos. *Asoc. Fcias. V. Caribe Specialty et al. II.*, 179 DPR 923, 940 (2010).

No obstante, la deferencia judicial cede cuando la actuación administrativa es irrazonable o ilegal y ante interpretaciones administrativas que conduzcan a la comisión de injusticias. *Asoc. Fcias. V. Caribe Specialty II,* supra, pág. 941. El estándar de revisión de las determinaciones administrativas está fundamentado en el principio rector de la razonabilidad, es decir, se examina que la agencia no haya actuado de manera arbitraria o ilegal, o de forma tan irrazonable que sea considerado un abuso de discreción. *Rolón Martínez v. Caldero López,* 201 DPR 26, 35 (2018); *Torres Rivera v. Policía,* 196 DPR 606, 626 (2016). A través de la revisión judicial, los tribunales debemos asegurarnos que las agencias administrativas actúen de acuerdo con las facultades delegadas por ley y que cumplan con los mandatos constitucionales que rigen el ejercicio de su función, especialmente con los requisitos del debido proceso de ley. *Comisión Ciudadanos v. G.P. Real Property,* 173 DPR 998, 1015 (2008).

III

En esencia, este recurso de revisión nos requiere resolver si el Administrador de la ORIL tiene la facultad de establecer, mediante órdenes administrativas, la cantidad fija de excedente de leche que cada planta recibirá para suplir su demanda de leche fluida y no fluida, y de ordenar la cantidad de excedente de leche que Suiza y VTM tendrán que enviar a Indulac para cumplir con lo anterior. Ello, requiere determinar si las Órdenes Administrativas 2022-61, 2022-62 y 2022-64 son reglas legislativas que crean derechos, imponen obligaciones y establecen un patrón de conducta que tiene fuerza de ley. O si por el contrario, se trata de reglas no legislativas que no alteran derechos ni obligaciones.

Suiza planteó que las órdenes impugnadas son reglas legislativas en tanto aplican a todas las plantas elaboradoras de leche fresca en el país; pretenden ejecutar o interpretar la Ley 34-1957, basándose en el deber del Administrador de ORIL de formular planes para disponer de la leche excedente; y regulan los procedimientos y prácticas de la industria

con fuerza de ley, pues su incumplimiento conlleva la imposición de multas y penalidades. Argumentó que, tratándose de reglas legislativas que enmiendan las definiciones estatutarias y reglamentarias de los términos  elaboradores, excedente de leche, y leche retenida, la ORIL venía obligado a seguir el procedimiento formal que exige la LPAU para revocar, emendar o suspender reglas legislativas.

Por su parte la ORIL alegó que las órdenes impugnadas son decretos basados en el Reglamento 10, el cual fue previamente aprobado con el propósito de establecer los criterios bajos los que se canalizara la leche. Enfatizó que el Administrador está facultado por la Ley 34-1957 para planificar el uso del excedente de leche conforme a las prioridades y los criterios establecidos en el Reglamento 10 en beneficio de la industria lechera y que la canalización ordenada cumple con tales cuerpos normativos. Según abundó, las órdenes meramente estiman el excedente de leche, según la utilización del año anterior, y lo distribuyen conforme la necesidad de cada elaboradora para garantizar que todas reciban suficiente abasto para sus operaciones. De haber un grado de necesidad mayor o menor, las órdenes permiten que la elaboradora solicite una variación.

Luego de analizar la controversia planteada a luz del ordenamiento reseñado es forzoso concluir que las órdenes administrativas impugnadas son reglas legislativas que por no cumplir con las disposiciones de la LPAU para enmendar o adoptar reglamentos, son nulas.[6]  Veamos.

La Orden 61 ordena a Suiza, VTM e Indulac que a partir del 10 de noviembre de 2022, <u>reciban</u> un abasto de leche cruda excedente <u>específico</u> para suplir su demanda de leche fluida y no fluida. Ordena además, que <u>informen</u> su plan de utilización de leche excedente para el próximo periodo. De manera similar, las Órdenes 61 y 62 ordenan que

---

[6] Aunque las órdenes administrativas recurridas, OA 2022-61, OA 2022-62 y OA 2022-64 tenían una vigencia limitada desde el 8 de noviembre de 2022 hasta el 7 de diciembre de 2022, hemos decidido ejercer nuestra facultad de revisión toda vez que la controversia planteada es una susceptible de volver a ocurrir y evadir la revisión judicial debido a la naturaleza de los procesos. Además, subsisten consecuencias colaterales de las órdenes impugnadas, tales como la posible imposición de multas por el incumplimiento con éstas.

desde el 10 de noviembre hasta el al 7 de diciembre de 2022, Suiza, VTM e Indulac utilicen el excedente de leche en las proporciones ordenadas para la elaboración de productos fluidos y no fluidos.[7] Ordenan a su vez que Suiza y VTM envíen a Indulac un volumen específico de excedente.[8] También requieren informar por escrito al Administrador la necesidad de retener más leche cruda para la elaboración de leche fresca. Todas las órdenes impugnadas advierten que su incumplimiento podrá ser sancionado con multas administrativas y penalidades.

Según vimos, la Sec. 8 del Reglamento 10 establece la forma en que el Administrador de la ORIL podrá canalizar el excedente de leche. Al respecto se dispone que, solo después que las elaboradoras de leche fresca, entiéndase Suiza y VTM, agoten la demanda de leche cruda para producir leche fresca, el excedente se utilizará para la elaboración de otros productos. El orden de prioridad de los productos a ser elaborados con el excedente de leche, entiéndase productos fluidos y no fluidos que no son leche fresca, se determinará a base del rendimiento económico para el ganadero, comenzado con los de mayor rendimiento.[9] El excedente de leche que ha ser retenido o transferido a otra elaboradora o elaboradora de productos derivados de la leche, tiene que contar con la aprobación del Administrador de la ORIL. Esto es asi ya que, la autorización del Administrador para la retención o transferencia de excedente de leche requiere que se demuestre que dicho excedente no puede ser elaborado como leche fresca. Se establece además que el Administrador de la ORIL adjudicará las porciones de excedente de leche

---

[7] OA 2022-62 para la quincena del 10 al 23 de noviembre de 2022:
    Suiza 703,838 cuartillos (35%); VTM 103,325 cuartillos (5%) e Indulac 1,187,289 cuartillos (60%), para elaboración de productos fluidos; y
    Suiza 84,606 cuartillos (14%); VTM 253,058 cuartillos (42%) e Indulac 268,131 cuartillos (44%), para elaboración de productos no fluidos.
OA 2022-64 para la quincena del 24 de noviembre a 7 de diciembre de 2022:
    Suiza 703,838 cuartillos (35%); VTM 103,325 cuartillos (5%) e Indulac 1,187,289 cuartillos (60%), para elaboración de productos fluidos; y
    Suiza 84,606 cuartillos (14%); VTM 253,058 cuartillos (42%) e Indulac 268,131 cuartillos (44%), para elaboración de productos no fluidos.
[8] OA 2022-62: Suiza 1,067,525 cuartillos y VTM 387,904 cuartillos;
    OA 2022-64: Suiza 1,201,978 cuartillos y VTM 477,279 cuartillos.

[9] Es decir, el excedente de leche debe ser utilizado primordialmente para la elaboración de los productos derivados de la leche que ofrezcan mayor rendimiento para los ganaderos.

solicitadas por los elaboradores según las necesidades de cada uno de ellos.

A diferencia del trámite ordenado por el Reglamento 10 para la canalización del excedente de leche, las órdenes impugnadas establecen la cantidad específica de excedente de leche que Suiza, VTM e Indulac utilizarán para la elaboración de productos derivados de la leche. Esto, sin tomar en cuenta que dicho excedente se determina después de que Suiza y VTM suplen su necesidad para elaborar leche fresca. El efecto de dichas órdenes es que las elaboradoras de leche fresca limiten su producción de este producto de manera tal que puedan garantizar el excedente de leche específico que se les requiere retener o transferir. Ignorando, a su vez, el requisito de justificar por qué el volumen de excedente a ser retenido o trasferido, no puede usarse para elaborar leche fresca.

Las órdenes también establecen la cantidad específica de excedente de leche que las elaboradoras podrán utilizar para productos fluidos y para productos no fluidos. A su vez, exigen a Suiza y VTM transferir a Indulac un volumen específico de excedente de leche. El Reglamento 10 nada dispone en cuanto a estos asuntos. Por el contrario, la Sec. 8 del Reglamento 10 condiciona la producción de productos derivados de la leche al nivel de rendimiento que tengan para el ganadero, no a la demanda que de esos productos tengan las elaboradoras. Asimismo, la Sec. 8 del Reglamento 10, no impone a Suiza y VTM una cantidad fija de excedente de leche a ser transferido a Indulac, si no que dispone que el Administrador adjudicará las porciones de excedente solicitadas por las elaboradoras según sus necesidades y las proyecciones realizadas.

En síntesis, las órdenes administrativas impugnadas alteran en varias instancias los parámetros establecidos en el Reglamento 10 para la canalización del excedente de leche. En particular, crean derechos que no existen, a saber, posibilita que Indulac reciba  de Suiza y VTM una

cantidad fija de excedente de leche para suplir su demanda de productos derivados. Imponen obligaciones que no existen, a saber: 1) exigen que Suiza y VTM entreguen una cantidad específica de excedente de leche a Indulac; y 2) ordenan que Suiza, VTM e Indulac utilicen volúmenes específicos de excedente leche para la producción de productos fluidos y productos no fluidos. También establecen conductas que tiene fuerza de ley, pues de no cumplir con las obligaciones impuestas, las elaboradoras se exponen a multas administrativas y penalidades.

Aunque en las órdenes impugnadas se le da la oportunidad a Suiza y VTM de retener más leche cruda para elaborar leche fresca, después de notificarlo al Administrador, esto no cambia el hecho de que se trata de reglas que crean derechos, imponen obligaciones y establecen patrones de conducta con fuerza de ley. Bajo el Reglamento 10, ninguna de las plantas está obligada a justificar la cantidad de leche cruda que retendrán para elaborar leche fresca. Solo se requiere justificación para retener o transferir excedente de leche.

Es de notar que el Reglamento 10 dispone que el Administrador de la ORIL está facultado para establecer mediante órdenes administrativas el precio de la leche cruda, los precios máximos, mínimos y únicos de la leche fresca y para ordenar una expansión en la producción de leche cruda. Secs. 6 y 9 del Reglamento 10. Sin embargo, dicho cuerpo reglamentario no provee para que el Administrador varíe la canalización establecida del excedente de leche mediante órdenes administrativas.

Entendemos la importancia que tiene para la industria una adecuada distribución del excedente de leche y la operación óptima de una planta balance como Indulac, en aras de atender los cambios en el patrón de consumo de leche que informa la ORIL. No albergamos duda de la facultad del Administrador de la ORIL para reglamentar la producción, elaboración y venta de leche y sus productos derivados en Puerto Rico. 5 LPRA sec. 1096. En específico, cuenta con poder para formular los planes necesarios para disponer de la leche excedente con el

objetivo de proteger la industria. 5 LPRA sec. 1096 (b)(4). Ahora bien, si las reglas que pretende adoptar mediante órdenes administrativas como las aquí impugnadas, varían los derechos dispuestos y las obligaciones reconocidas en la Ley 34 y el Reglamento 10, estas tienen que cumplir con el procedimiento de reglamentación exigido por la LPAU. Cónsono con ello, la Ley 34, establece el proceso a seguir por el Administrador de la ORIL para la adopción de un reglamento en la industria que tenga fuerza de ley. el Art. 12, 5 LPRA sec. 1103

IV

Por los fundamentos antes expuestos declaramos nulas las Órdenes Administrativas 2022-61; 2022-62 y 2022-64 emitidas por el Administrador de la ORIL.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal, y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones